Filed: February 16, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON

WEBER COASTAL BELLS LIMITED PARTNERS,
an Oregon limited partnership;
PLAID PANTRIES, INC.;
and JANTZEN/ANGEL, LLC,

Petitioners below,

and

NORTHEAST COALITION OF NEIGHBORHOODS
and COALITION FOR A LIVABLE FUTURE,

Petitioners,

v.

METRO
and TRIMET,

Respondents.

(LUBA 2011-080, 2011-081, 2011-082, 2011-083; SC S059872)

En Banc

On direct review from the Land Use Board of Appeals under Oregon Laws 1996, chapter 12, section 10.

Argued and submitted December 6, 2011.

Sean T. Malone, Eugene, argued the cause and filed the brief for petitioners.

Mark J. Greenfield, Portland, argued the cause and filed the brief for TriMet. With him on the brief was Richard Benner, Portland, for Metro.

DE MUNIZ, C. J.

The opinion of the Land Use Board of Appeals is affirmed, and the land use final order of Metro is affirmed in part and remanded in part, consistent with the opinion of the Land Use Board of Appeals.

DE MUNIZ, C. J.

Petitioners, Northeast Coalition of Neighborhoods and Coalition for a Livable Future, seek direct review under Oregon Laws 1996, chapter 12, of a decision by the Land Use Board of Appeals (LUBA) that affirmed in relevant part a land use final order by respondent Metro.[1] The land use final order at issue concerns the Columbia River Crossing Project, which (among other things) would extend a light rail line from Oregon to Washington. Petitioners contend that Metro either exceeded its statutory authority in adopting the order or that its decisions in the order were not supported by substantial evidence. Respondents Metro and Tri-County Metropolitan Transit District of Oregon (TriMet) oppose the petition. We affirm the land use final order.

We set out the undisputed facts from the record. The South North MAX Light Rail Project involves the construction of a light rail line from Clackamas Town Center in Happy Valley, Oregon, to Vancouver, Washington, via the cities of Milwaukie and downtown Portland. To aid that project, the legislature enacted a law in 1996 that was never codified into the Oregon Revised Statutes: Or Laws 1996, ch 12. Before turning to the specific issues presented here, we first consider the 1996 act in some detail.

---

[1] In its final opinion and order, LUBA concluded that Metro had exceeded its authority by including in the land use final order parts of the project that lay outside Portland's urban growth boundary. *Weber Coastal Bells Ltd. Partners v. Metro*, ___ Or LUBA ___, ___ (LUBA Nos. 2011-080, 2011-081, 2011-082, and 2011-083, Oct 26, 2011) (slip op at 11). LUBA remanded those parts of the land use final order, affirming the remainder of the order. *Id.* at ___ (slip op at 32). No party has sought review of LUBA's conclusions regarding the remand, so the remand is not relevant to our disposition on review.

Section 2 of the 1996 act explains its purposes. The legislature intended to facilitate the South North MAX Light Rail Project as part of the "transportation system planned for the Portland metropolitan area." Or Laws 1996, ch 12, § 2(1). According to the legislature, that planned transportation system is important to "the ability of the area to implement a significant portion of its air quality and energy efficiency strategies and the ability of affected local governments to implement significant parts of their comprehensive plans." *Id.*

The act established decision-making procedures for the South North MAX Light Rail Project and to provide for expedited appellate review of those decisions. *Id.* § 2(1)(a) - (c). The procedures are intended to maximize federal funding for the project and to ensure that the project is constructed in a timely and cost-effective manner. *Id.* Utilization of the decision-making procedures results in a "land use final order," *id.* § 2(1)(a), a defined term that means:

"a written order or orders of [Metro] council deciding:

"(a) The light rail route for the project or project extension, including its location;

"(b) Stations, lots and maintenance facilities for the project or project extension, including their locations; and

"(c) The highway improvements for the project or project extension, including their locations."

*Id.* § 1(13).

The procedures that the legislature prescribed in the 1996 act operate as follows. First, the Land Conservation and Development Commission (LCDC) was required to establish the criteria later to be used by Metro to make its decisions leading to

3

a land use final order. *Id.* § 4. (Those criteria since have been adopted.) TriMet then applies to Metro for a land use final order. *Id.* § 6(1)(a). Metro, using the criteria established by LCDC, follows prescribed procedures to determine whether to enter a land use final order or to refer the matter back to TriMet. *Id.* §§ 6(1)(b), 7. When Metro adopts a land use final order, that order must be accompanied by findings of fact. *Id.* § 7(7).

Once Metro adopts a land use final order, any challenges to that order first must be made before LUBA. *Id.* § 9. The only persons or entities who may seek review are those who appeared before Metro, and the only issues that they may raise are those previously presented to Metro. *Id.* §§ 9(3)(b), 9(4). The process before LUBA is expedited. Among other requirements, LUBA must hear oral argument within 35 days from the date of the notice of intent to appeal, *id.* § 9(11), and the final opinion of LUBA must issue within 28 days after argument, *id.*

Any party who appeared before LUBA may petition this court for review. *Id.* § 10(1). Although the process is called a petition for review, it does not follow the ordinary process for petitions for review filed with this court from Court of Appeals decisions. Under the 1996 act, the petition for review, which must be filed within 14 days after LUBA's decision, must be in the form of a brief containing argument. *Id.* § 10(1) ("The petition shall be in the form of a brief and shall state, with particularity and with supporting authority, each reason asserted for reversal or modification of the board's decision."). Any respondent has 14 days to respond; if the party does not file a response, the party's brief before LUBA is treated as the response. *Id.* § 10(2). The 1996 act does

4

not suggest that this court has any discretion as to whether to allow review, and it does not provide for any further briefing; instead, it states only that the matter may be decided on the briefs or proceed to oral argument. *Id.* § 10(3). This court must "decide the matter at its earliest practicable convenience." *Id.*

At issue here is the fifth land use final order adopted by Metro relating to the South North MAX Light Rail Project. (The first, adopted in 1998, addressed the South North MAX Light Rail Project as a whole. That original land use final order has been amended three times previously by separate land use final orders.) The present land use final order addresses one segment of the South North MAX Light Rail Project, known as the Columbia River Crossing Project. The Columbia River Crossing Project is the portion of the South North MAX Light Rail Project that extends from the Expo Center and the Interstate 5 (I-5)/Victory Boulevard Interchange in north Portland to the Oregon/Washington state line on the Columbia River.

Metro's land use final order for the Columbia River Crossing Project approves many highway improvements, and it is the extent of those highway improvements that form the basis of petitioners' objections to the land use final order. Although the land use final order contains less controversial provisions, such as realignment of the light rail route and relocation of the Hayden Island station, it also approves the replacement of the existing I-5 bridges across the Columbia with new northbound and southbound bridges. Only the lower deck of the new southbound bridge

will carry the light rail line; the upper decks will carry highway traffic.[2] The land use final order also approves the following:

> "widening of Interstate 5 in both directions between approximately N Victory Boulevard and the Oregon/Washington state line on the Columbia River; new or modified interchanges at N Marine Drive, Hayden Island and Victory Boulevard; a new integrated rail/vehicular/bicycle[/]pedestrian bridge connecting Hayden Island with the Expo Center; and roadway realignments, widenings, modifications and new connections within the project area."

Petitioners sought review of Metro's land use final order before LUBA, arguing that the land use final order both exceeded Metro's statutory authority and "was not supported by substantial evidence in the whole record." *See* Or Laws 1996, ch 12, § 9(12)(a)(B), (C) (prescribing standards of review for LUBA). Among other arguments, petitioners asserted that Metro had exceeded its statutory authority by adopting a land use final order that was, they contended, primarily devoted to highway improvements. According to petitioners, the highway improvements that the order approved form 75 percent of the cost of the Columbia River Crossing Project. Petitioners asserted that those highway improvements were not sufficiently connected to the light rail project because they were "not needed to mitigate adverse traffic impacts associated with the light rail route, stations, lots or maintenance facilities." Petitioners additionally argued that the land use final order was not supported by substantial evidence because there was no evidence that the highway improvements were necessary for the light rail.

---

[2] The lower deck of the northbound bridge will carry bicycle and pedestrian traffic.

LUBA rejected the argument that Metro, in entering its land use final order, had exceeded its statutory authority. *Weber Coastal Bells Ltd. Partners v. Metro*, ___ Or LUBA ___, ___ (LUBA Nos. 2011-080, 2011-081, 2011-082, and 2011-083, Oct 26, 2011) (slip op at 12-16). Initially, LUBA was not persuaded by petitioners' contention that the proportion of cost attributable to highway improvements meant that the project was primarily a highway project, rather than a light rail project. The appropriate focus, LUBA concluded, was on the South North MAX Light Rail Project as a whole, not merely the Columbia River Crossing segment in isolation. As a whole, the South North MAX Light Rail Project is primarily about light rail. *Id.* at ___ (slip op at 13).

LUBA concluded that the 1996 act allowed Metro to choose the highway improvements that could be included in the project. *Id.* at ___ (slip op at 14) ("The text of the 1996 statute simply provides no basis for limiting the highway improvements that may be included in the Project in the way petitioners argue."). LUBA noted that the act defined the project to include "'the light rail route, stations, lots and maintenance facilities, and *any highway improvements* to be included in the project.'" *Id.* at ___ (slip op at 13) (emphasis in original; quoting Or Laws 1996, ch 12, § 1(18)). The definition of "highway improvements" similarly imposed very few limits on what highway improvements could be made part of the project, requiring only that the improvements must have been described in the project's draft and final environmental impact statements:

> "'Highway improvements' means the highway improvements, *if any*, to be included in the project or project extension. The highway improvements shall be selected from among the highway improvements, *if*

7

*any*, described in a Draft Statement or Final Statement for the project or project extension.'"

*Weber*, ___ Or LUBA at ___ (slip op at 13) (emphases in original; quoting Or Laws 1996, ch 12, § 1(12)). All the highway improvements at issue here had been described in the draft environmental impact statement. *Id.*

LUBA additionally noted that one of the criteria that LCDC had adopted referred to "associated highway improvements." *Id.* at ___ (slip op at 15). Even assuming that that criterion limited the highway improvements to those "associated" with the light rail, LUBA concluded that that relationship had been shown: Metro specifically had found that the highway improvements were "necessary to obtain support for the necessary local funding from Washington for the light rail component." *Id.* at ___ (slip op at 15-16).

LUBA also rejected petitioners' claim that the highway improvements had to be supported by substantial evidence showing that they were necessary to the light rail siting. Petitioners had not identified any law requiring such evidence, and LUBA already had concluded that the 1996 act did not require that the improvements be "necessary" to the project. *Id.* at ___ (slip op at 28).

Petitioners timely sought review by this court. *See* Or Laws 1996, ch 12, § 10(1). They renew the earlier arguments that we have discussed, albeit with some additional elaboration. Respondents did not file a response to the petition for review; accordingly, their brief in LUBA functions as their response. *See id.* § 10(2). We now turn to the first issue, that is, whether Metro exceeded its statutory authority when it

8

adopted the land use final order that included the highway improvements.

Petitioners argue that Metro exceeded its statutory authority because Metro has not been given "unbridled discretion" over what highway improvements may be included in the South North MAX Light Rail Project under the 1996 act. Petitioners assert that the highway improvements must have a "sufficient nexus" to the light rail siting. Petitioners contend that the only highway improvements with a "sufficient nexus" are those "in furtherance of or necessitated by the Light Rail siting." The land use final order at issue here, petitioners urge, contains significant highway improvements "that not only dwarf the Light Rail siting but, at times, are unrelated and not necessitated by the Light Rail siting." Petitioners identify the highway improvements to North Marine Drive in particular as not being necessitated by the light rail siting.

Petitioners attempt to draw support for their argument from a number of provisions of the 1996 act. In the main, petitioners rely on the definition of "project":

> "'Project' means the portion of the South North MAX Light Rail Project within the Portland metropolitan area urban growth boundary * * *. The project includes the light rail route, stations, lots and maintenance facilities, and any highway improvements to be included in the project."

*Id.* § 1(18). Because the other items in that list -- "the light rail route, stations, lots and maintenance facilities" -- are all necessary to the light rail, petitioners conclude that a similar restriction should exist regarding "highway improvements."

Petitioners also note that a number of provisions of the 1996 act qualify the term "highway improvements" with the prepositional phrase "for the project." *See id.* § 1(13)(c) (definition of "land use final order" means written order by Metro Council

9

determining "[t]he highway improvements for the project"); *id.* § 3(3) (1996 act establishes the only procedures applicable to land use decisions "on the highway improvements for the project"); *id.* § 4 (directing LCDC to establish criteria to be used by Metro Council to determine "the highway improvements for the project"); *id.* § 6(1) (land use final order must establish "the highway improvements for the project"). Petitioners suggest that the phrase "highway improvements for the project" requires that some relationship -- *viz.*, a "substantial nexus" -- exist between the light rail and the highway improvements.

For their part, respondents concede that the 1996 act does impose some limits on the highway improvements that may be included within a land use final order. In particular, respondents acknowledge that the highway improvements must be described in the environmental impact statements. *See id.* § 1(12) (defining "highway improvements" to be those "described in a Draft [Environmental Impact] Statement or Final [Environmental Impact] Statement for the project"). Similarly, respondents do not dispute on review that the highway improvements must be located within Portland's urban growth boundary. *See id.* § 1(18) (defining "project" to specifically limit it to the portions of the South North MAX Light Rail Project that are "within the Portland metropolitan area urban growth boundary"); *Weber*, ___ Or LUBA at ___ (slip op at 11, 32) (concluding that Metro exceeded its statutory authority in approving "a Project that is not located entirely within the [urban growth boundary]," and remanding those parts of the land use final order that approved project parts lying outside the urban growth boundary).

Beyond those concessions, however, respondents assert that the 1996 act imposes only very limited restrictions on the highway improvements that may be made part of the project. Relying on the same definition of "project" as petitioners, respondents note that the act states that "[t]he project includes * * * *any* highway improvements to be included in the project." Or Laws 1996, ch 12, § 1(18) (emphasis added); *see also id.* § 1(12) (defining "highway improvements" to mean "the highway improvements, *if any*, to be included in the project" (emphasis added)); *id.* § 2(1)(a) (purpose of act is "[t]o establish the process to be used in making decisions in a land use final order on * * * *any* highway improvements to be included in" the project (emphasis added)). Respondents urge that the open-ended term "any" suggests that the legislature did not intend to require any connection between the light rail and the highway improvements.[3]

We need not determine to what extent (if any) the 1996 act requires highway improvements to have a demonstrated relationship to the light rail siting.[4] As

---

[3] That summarizes respondents' position before LUBA. At oral argument before this court, counsel for respondents suggested that the requirement that the highway improvements be described in the environmental impact statements implicitly required the highway improvements to have some connection to the light rail project. Counsel did not cite any law for that proposition, however, and did not explain what sort of connection might be required.

[4] Although we do not decide the question, it is possible that the legislature did not intend the 1996 act itself to require any particular relationship between the highway improvements and the light rail; rather, it may have intended to delegate that function to LCDC. Section 2 of the 1996 act states that one purpose of the act is

"[t]o establish the process to be used in making decisions in a land use final order on * * * any highway improvements to be included in the

11

we shall explain, Metro found that the construction of new highway bridges across the Columbia River were required politically, to obtain the necessary Washington State support for the project. Metro also found that the other highway improvements were necessary either because of the new bridges or because of the light rail itself. Thus, even if petitioners are correct that the 1996 act permits only those highway improvements that are necessary to the light rail siting, that necessity exists for all the highway improvements described in Metro's land use final order.

Metro found -- and petitioners do not dispute -- that the political necessity of new highway bridges over the Columbia was demonstrated early on, and it was entirely beyond the control of Metro. Washington State approval is necessary because the project extends into Vancouver, but the voters of Clark County, Washington, rejected at the ballot box a light-rail-only bridge across the Columbia. As Metro explained, "[i]t was clear from this action that a stand-alone light rail project was not politically acceptable to the voters of Clark County."[5] Afterward, a bistate group called the I-5

South North MAX Light Rail project, including their locations[.]"

Or Laws 1996, ch 12, § 2(1)(a). Section 4 provides, in part:

"The Land Conservation and Development Commission shall establish criteria to be used by [Metro] council in making decisions in a land use final order on * * * the highway improvements for the project and project extension, including their locations."

[5] More specifically, Metro explained in its findings of fact that the original project proposal would have crossed the Columbia River

"via a *proposed new bridge for light rail transit purposes only* west of the

12

Transportation and Trade Partnership was formed to examine the question. In its published conclusions, the Partnership explained that the area transportation problems required a comprehensive solution. As Metro later summarized the Partnership's conclusions, Oregon and Washington had different interests: Although "Oregon interests required emphasis on a multi-modal solution * * * because of the difficulty of accommodating [traffic] demand through a highway-only expansion of I-5," Clark County interests "needed a highway element because the land use patterns of Clark County require[] a system with greater dependence on auto access."

For those reasons, it was politically impossible for the light rail project to proceed without also building new interstate bridges across the Columbia River:

> "The Council finds that the Project reflects negotiation and compromise among governmental bodies and that for all practical purposes, the light rail component could not have gone forward without the highway component and the highway component could not have gone forward without the light rail component."

Or as Metro later summarized it: "There is no[] light rail without the freeway bridge[s] being replaced." Thus, Metro found, "the highway improvements are necessitated by the

---

existing I-5/Interstate Bridge. TriMet successfully obtained voter support of General Obligation Bonds for one-third of the local match in November 1994 by a wide margin. That ballot measure was predicated on a state legislative contribution of another one-third and a Washington State/Clark County contribution of the final one-third. In early 1995 the voters of Clark Co. turned down a ballot measure for their local match contribution[.] It was clear from this action that a stand-alone light rail project was not politically acceptable to the voters of Clark County."

(Emphasis added.)

13

light rail improvements."

Although political realities may have made the new bridges necessary, the bridges themselves made additional highway improvements necessary, including alterations to the North Marine Drive interchanges specifically mentioned by petitioners.[6] The light rail construction itself also made necessary other changes to North Marine Drive.[7] Petitioners do not attempt to refute those findings by Metro.

---

[6] The findings of fact by Metro state:

"The Council further finds that construction of these new bridge structures will necessitate improvements to the I-5 highway and interchanges, including the Hayden Island and Marine Drive Interchanges, and to the local street network that connects those interchanges including realignments, widening or extensions of or new connections between N Marine Drive [and other listed streets] * * *. [Metro Council] also finds that additional highway improvements are needed to integrate the transit corridor extension into the existing transportation network and to facilitate multimodal access to and from the existing light rail station at the Expo Center and a new light rail station at Hayden Island."

Elsewhere in the findings, Metro explained:

"[T]he associated highway improvements directly and indirectly serve the light rail improvements by accommodating the alignment (*e.g.*, new I-5 bridges, new arterial bridge over the North Portland Harbor) or providing regional and local access to the Expo Center and Hayden Island light rail stations (*e.g.*, I-5 interchange improvements, access and circulation improvements and roadway modifications on Hayden Island and in the vicinity of the Marine Drive interchange). The Council further finds that some of the highway improvements are needed for engineering purposes to accommodate the new bridge containing the light rail alignment and the modifications to the I-5 interchanges and their approaches."

[7] Because the light rail tracks required "grade-separated crossings" with existing roads, those crossings "necessitate modifications to the I-5/Marine Drive Interchange and connecting roadways including the realignments of N Vancouver Way

14

Petitioners do not address political necessity in the section of their petition contending that Metro lacked statutory authority to adopt the land use final order. In the section arguing that the land use final order was not supported by substantial evidence, however, petitioners assert that political necessity is not sufficient justification for the highway improvements because Metro "relies upon a purely political calculation, which is without factual basis or professional opinion, such as an engineering report." Petitioners maintain that the highway improvements are a political "inducement" that is "not * * * actually in furtherance of or necessitated by the Light Rail siting."

To the extent that petitioners maintain that the 1996 act permits only those highway improvements that the light rail siting would require as an engineering matter, we are not persuaded. Petitioners do not identify any part of the 1996 act (or any other authority) that even arguably limits the highway improvements to those made necessary for engineering reasons only, and we are not aware of any. The statutory references to "highway improvements for the project" do not limit the reasons that might make a particular highway improvement necessary for the project. Even accepting petitioners' assertion that the necessity to the light rail of "the light rail route, stations, lots and maintenance facilities" also should be imputed to "highway improvements," nothing about that necessity implies only engineering necessity. We decline to defeat the stated legislative purpose of the 1996 act -- completion of the South North MAX Light Rail

and N Marine Drive."

15

Project[8] -- by reading an artificial limitation into it.

Petitioners also suggest that the land use final order exceeded Metro's statutory authority because the majority of the cost for the Columbia River Crossing Project is for highway improvements, rather than light rail improvements. Assuming for purposes of argument that it is appropriate to compare the cost of the highway improvements to the cost of the light rail,[9] we agree with LUBA that individual segments of the project should not be considered in isolation. *See Weber*, ___ Or LUBA at ___ (slip op at 13) (so noting). The 1996 act authorizes individual land use final orders that contain nothing but highway improvements. *See* Or Laws 1996, ch 12, § 6(2) ("Any siting of * * * a highway improvement outside the locations established in a land use final order, and any new * * * highway improvement, shall require a land use final order amendment or a new land use final order * * *."). The appropriate comparison is between the cost of highway improvements for the whole South North MAX Light Rail Project and the cost of the light rail improvements for the whole South North MAX Light Rail Project. Petitioners have not made any such comparison.

In summary, we conclude that Metro did not exceed its statutory authority

---

[8] *See* Or Laws 1996, ch 12, § 2(1) (act is intended "to assure the timely and cost-effective construction of the project").

[9] It is questionable whether a simple weighing of expense determines whether the project is primarily for purposes of light rail. For example, light rail construction might so disrupt existing roads that it would require significantly more expensive, but wholly necessary, highway improvements.

when it approved the land use final order containing these highway improvements. Even if the 1996 act limits highway improvements to those made necessary by the light rail siting, we conclude that the authority granted by the 1996 act is not limited to engineering necessity. The statutory authority granted to Metro included authority to approve highway improvements that political realities made necessary to the light rail project, at least when those political realities are not within Metro's control.[10]

Nonetheless, petitioners argue alternatively that no substantial evidence supported Metro's finding that the highway improvements were politically necessary. As quoted earlier, petitioners assert that Metro's finding of political necessity "is without factual basis or professional opinion, such as an engineering report."

The 1996 act prescribes that the land use final order must be remanded if we conclude that Metro

> "[m]ade a decision in the land use final order on the light rail route, on stations, lots or maintenance facilities, or the highway improvements, including their locations, that was not supported by substantial evidence in the whole record. The existence in the whole record of substantial evidence supporting a different decision on the light rail route, stations, lots or maintenance facilities, or the highway improvements, including their locations, shall not be a ground for remand if there also was substantial evidence in the whole record supporting the land use final order."

Or Laws 1996, ch 12, § 9(12)(a)(C) (setting out standard of review to be used by LUBA); *see id.* § 10(4) (directing this court to use the same standard or review as LUBA).

---

[10] In so concluding, we do not address whether the highway improvements approved by the land use final order were required to comply or did in fact comply with any requirements that may be imposed by other statutes or land use regulations.

17

We reject petitioners' claim that the political necessity found by Metro lacked a factual basis.  Petitioners do not dispute that Clark County voters previously rejected a light-rail-only bridge, neither do they claim that any particular finding by Metro was unsupported by the record.  Instead, petitioners' argument seems to be merely a variant of their suggestion that political necessity is insufficient as a matter of law -- that is, that no substantial evidence supported Metro's inclusion of the highway improvements, because evidence of political necessity is irrelevant.  Because we already have concluded that political necessity was a permissible reason for Metro to authorize those highway improvements contained in its land use final order, evidence of that political necessity is relevant.  We conclude that substantial evidence in the record supported the highway improvements contained in Metro's land use final order.

Petitioners thus have failed to show that Metro either exceeded its statutory authority or made a decision about the highway improvements that was not supported by substantial evidence on the whole record.  Because petitioners have not demonstrated a basis for remanding any portion of the land use final order, we must affirm.  Or Laws 1996, ch 12, § 9(12) (listing exclusive reasons for remanding land use final order); *id.* § 10(4) ("The court shall affirm all parts of the final order that it does not remand.").

The opinion of the Land Use Board of Appeals is affirmed,  and the land use final order of Metro is affirmed in part and remanded in part, consistent with the opinion of the Land Use Board of Appeals.